[Civ. No. 45823. Second Dist., Div. Two. Mar. 30, 1976.]

AETNA CASUALTY AND SURETY COMPANY,
Plaintiff and Respondent, v.
CERTAIN UNDERWRITERS AT LLOYDS OF LONDON,
ENGLAND et al., Defendants and Appellants.

COUNSEL

Hancock, Rothert & Bunshoft, Harlow P. Rothert and James E. Cusick for Defendants and Appellants.

Gibson, Dunn & Crutcher, Sherman Welpton, Jr., and John L. Endicott for Plaintiff and Respondent.

OPINION

BEACH, J.—Appellants[1] and respondent Aetna Casualty & Surety Co. (Aetna) were insurers of Union Oil Company (Union) in January 1969, at the time of the Santa Barbara oil well blow-out. Aetna defended Union to the exhaustion of the $50,000 monetary limit of its policy. The instant action for equitable subrogation and declaratory relief was filed because Aetna, although continuing to defend Union, believes its duty to defend ended at the exhaustion of the policy limit; that the other insurers should now take over defense of claims against Union; and that the legal fees and other expenses incurred by Aetna after the exhaustion of the policy limits should be paid to Aetna by the other insurers.

The trial court ordered that from the date of judgment Lloyds shall have the primary responsibility of defense; that Harbor has exhausted its policy limits so no longer shares this responsibility; and that the costs of defense should be apportioned based on a ratio of the amount paid by each insurer to the total amount of such indemnity payments paid by all insurers in the settlement of claims or the satisfactions of judgments. The trial court further ordered that Aetna recover from Harbor $242,974.20 plus interest, and $409,226.82 plus interest from the other insurers. When all the litigation against Union has been determined, the various costs will be prorated; the court retained jurisdiction for that purpose. Harbor and Lloyds appeal.

FACTS:

On February 7, 1967, Aetna issued a Comprehensive Liability Policy to Union covering occurrences from November 1, 1966; there was a limit

---

[1]Appellants are (1) Harbor Insurance Company (Harbor), and (2) Certain Underwriters at Lloyds of London, England, and certain other insurance companies (Lloyds).

of liability to $50,000 for each occurrence. On November 1, 1966, Harbor issued a policy for excess liability, insuring 50 percent of any loss after $50,000 to a liability limit of $475,000. Lloyds' insurance provided the other 50 percent of that liability also amounting to a possible $475,000 liability, and in addition provided about $21 million in excess insurance.

The Aetna policy provided in part:

### "INSURING AGREEMENTS

#### I LIABILITY

To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of:

. . . . . . . . . . . . . . . . . . .

(2) Injury to, or loss or destruction of property.

. . . . . . . . . . . . . . . . . . .

#### II DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS

With respect to such insurance as is afforded by this policy, the Company shall:

(a) defend any suit against the Insured alleging any such injury . . . and seeking damages on account thereof, even if such suit is groundless . . . ;

. . . . . . . . . . . . . . . . . . .

(d) pay all expenses incurred by the Company (Aetna), all costs taxed against the Insured in any such suit . . . until the Company has paid or tendered or deposited in court such part of such judgment as does not exceed the limit of the Company's liability thereon;

. . . . . . . . . . . . . . . . . . .

(f) reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred at the Company's request; and the amounts so incurred, except settlements of claims and suits, are payable by the Company in addition to the applicable limit of liability of this policy.

. . . . . . . . . . . . . . . . . . .

CONDITIONS

. . . . . . . . . . . . . . . . . .

6. DEDUCTIBLE

Except with respect to damages on account of . . . use . . . of automobiles, the Company shall be liable, as respects each occurrence, only for the excess of all damages and allocated claim expense over $5,000. . . .

. . . . . . . . . . . . . . . . . .

The Company shall have the . . . obligation . . . to settle any claim or suit against the Insured . . . , provided, with respect to . . . damages and allocated claim expense on account of injury to property . . . the Company shall be reimbursed by the Named Insured for all sums so incurred, but not for any amount in excess of $5,000.00 as respects any one occurrence."

On January 28, 1969, an oil well operated by Union in the Santa Barbara Channel blew out, oil was discharged, and numerous suits were filed against Union. Aetna undertook the defense of the suits and the investigation, negotiation and settlement of the various claims. By August 25, 1969, Aetna had paid $50,000 in settlement of claims against Union as a result of that occurrence. Some time prior to August 25, 1969, Aetna advised Harbor and Lloyds that Aetna believed once it had paid out its $50,000 limit, it had fulfilled its duty to defend Union and should be relieved of that duty. Harbor and Lloyds disagreed. While reserving its rights to contend it had no further duty to defend and to seek reimbursement for defense expenses subsequent to its payment of $50,000, Aetna continued to defend Union against claims resulting from the blowout.

As of November 30, 1970, Harbor had paid its policy limits of $475,000 in settlement but refused to pay any portion of the legal and other fees and expenses connected with the defense of the pending suits and the investigation, negotiation and settlement of the remaining claims. As of August 31, 1973, Lloyds had paid over $800,000 in settlement of some of the many claims against Union. Like Harbor, Lloyds refused to pay any portion of the legal and other fees and expenses.

The Harbor and Lloyds policies provide in part:

"1. The insurers hereon . . . hereby agree, . . . to pay . . . all sums which the assured shall . . . become liable to pay . . . as damages . . . for damage to or destruction of property of others, as covered in the underlying policy/ies issued by The Aetna Casualty & Surety Company . . . hereinafter called the 'primary insurers'.

2. (A) Provided always that . . . liability shall attach to insurers only after the primary insurers have paid or have been held liable to pay the full amount of their respective ultimate net loss liability of $50,000.00 any one . . . occurrence . . . .

. . . . . . . . . . . . . . . . . . . .

4. PAYMENT OF COSTS. 'Costs' incurred by the assured personally with the written consent of Insurers, and for which the assured is not covered by the said primary insurers, shall be apportioned as follows:

(A) In the event of . . . claims arising which appear likely to exceed the primary . . . limits, no 'costs' shall be incurred by the assured without the written consent of insurers.

. . . . . . . . . . . . . . . . .

(C) Should, however, the sum for which the said . . . claims may be so adjustable exceed the primary . . . limits, then insurers, if they consent to the proceedings continuing, shall contribute to the 'costs' incurred by the assured in the ratio that their proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss.

. . . . . . . . . . . . . . . . . . . .

(E) COSTS. The word 'costs' shall be understood to mean interest on judgments, investigation, adjustment and legal expenses, (excluding, however, all expenses for salaried employees and retained counsel of and all office expense of the assured).

. . . . . . . . . . . . . . . . . .

7. MAINTENANCE OF PRIMARY INSURANCE. This contract is subject to the same warranties, terms, conditions, exclusions and definitions (except as

regards the premium, the obligation to investigate and defend . . .) as are contained in . . . the policy/ies of the primary insurers . . . ."

Aetna retained the law firm of O'Melveny & Myers to defend Union in connection with the lawsuits filed as a result of the blowout. Through August 1969, Aetna paid the firm $48,740 plus $2,072.50 for disbursements. From September 1, 1969, through November 30, 1970, $128,005.05; and from November 30 to February 28, 1973, Aetna paid O'Melveny & Myers $230,164.40 in fees and disbursements. For adjustments of claims, Aetna paid Crawford and Company $27,860.15 through August 1969; for services rendered from September 1, 1969, through November 30, 1970, $8,241.23; and from November 30, 1970, to December 31, 1972, $926.56. For other expenses, Aetna has paid or is obligated to pay $231,884.40 as of March 31, 1973; $19,135.87 was reimbursed for expenses through August 1969; $54,445.56 for expenses from September 1, 1969, to November 30, 1970; and $158,302.97 for expenses after November 30, 1970.

Based on these facts, the trial court found all the insurers have a responsibility of furnishing defense for Union, but the primary responsibility rested with Aetna until the exhaustion of its policy limits. Then the defense would shift to the excess carriers (appellants) unless the position of Union would thereby be put in jeopardy. Since Harbor has exhausted its policy limits, the trial court concluded it no longer has a share in the primary responsibility of conducting such defense. After final judgment in the instant case, the primary responsibility will shift to Lloyds. As for the costs of defense, they should be apportioned among the insurers based upon a ratio of the amount paid by each insurer to the total amount paid by all insurers in the settlement of claims and the satisfaction of judgments; as of the date of judgment, that was 3.77 percent for Aetna, 35.85 percent for Harbor, and 60.38 percent for Lloyds; but the court noted that those percentages will change.

CONTENTIONS ON APPEAL:

1. Aetna has an obligation to defend Union even after its policy limits have been exhausted.

2. The costs incurred by Union are covered by the Aetna policy, and the excess insurers are not responsible therefor. Harbor additionally argues that if Aetna was no longer liable for costs after the exhaustion of its policy limits, that any obligation of Harbor to reimburse costs was similarly terminated upon exhaustion of its policy limits.

DISCUSSION:

*Duty to defend after exhaustion of policy limits.*

The question of whether an insurer must continue to defend claims that are proper under the substantive provisions of the policy after the monetary limits of the policy have been reached has not been answered by any California appellate decision.[2] Courts of other jurisdictions have reached varying results. (See, e.g., *Lumbermen's Mut. Casualty Co.* v. *McCarthy* (1939) 90 N.H. 320 [8 A.2d 750, 126 A.L.R. 894], the seminal case holding the duty to defend ends with the policy limits, assuming no prejudice attaches to the insured; *American Employers Ins. Co.* v. *Goble Aircraft Sp.,* 205 Misc. 1066 [131 N.Y.S.2d 393, 154 N.Y.S.2d 835], holding that the insurer is required to defend irrespective of the ultimate liability of the assureds; "Liability Insurer's Duty to Defend Action Against an Insured After Insurer's Full Performance of its Payment Obligations Under Policy" (27 A.L.R.3d 1057.))

*Lumbermen's Mutual, supra,* 8 A.2d at p. 752, and cases based thereon rely principally on the idea that the insurer's primary obligation was to pay damages and that "other provisions were dependent thereon and designed to implement that primary obligation."[3] This line of cases also mentions the lack of interest in the defense by an insurer whose policy limits have already been exhausted.

The other line of cases is based on the duty to defend being separate from and/or broader than the duty to pay. Some follow the policy that ambiguous language is to be construed against the insurer and since the policy language is not clear in making the duty to defend end at the policy limit, said duty continues.[4]

[2]Language in *Comunale* v. *Traders & General Insurance Company,* reported in 321 P.2d 768 cited by counsel for appellant declared the duty to defend was separate from that to pay irrespective of policy limits. As the same counsel recognizes, that decision was vacated by the opinion of the Supreme Court of California in *Comunale* v. *Traders & General Ins. Co.,* 50 Cal.2d 654 [328 P.2d 198] and we do not consider the former opinion legal or persuasive authority to hold Aetna to the obligation sought by appellant. The question was not reached in the later decision.

[3]In *Lumbermen's Mutual,* the insurer had already defended actions by two plaintiffs against its insured; the policy limit was paid to one successful plaintiff after the appeal. There was a new trial as to the other plaintiff, and it was that new trial that Lumbermen's did not want to defend.

[4]Cf. *National Union Ins. Co.* v. *Phoenix Assur. Co. of N.Y.,* 301 A.2d 222, 225, where the primary policy limited expenses to "until the company has paid . . . such part of such judgment as does not exceed the limit of the company's liability thereon." Many policies now contain similar language regarding the duty to defend.

The Aetna policy contains separate paragraphs for liability and defense. The insurer agrees that "With respect to such insurance as is afforded by this policy, [it] shall: (a) defend any suit against the Insured alleging any such injury . . ., and seeking damages on account thereof, even if such suit is groundless . . . ." Appellant argues that the phrase "Such insurance as is afforded by this policy" is ambiguous. It could refer to the type of insurance (i.e., injury to or loss or destruction of property) or to the type *and* amount of insurance. It has been said, "If the insurer uses language which is uncertain any reasonable doubt will be resolved against it; if the doubt relates to extent or fact of coverage, whether as to peril insured against . . . , the amount of liability . . . or the person or persons protected . . . the language will be understood in its most inclusive sense, for the benefit of the insured." (*Continental Cas. Co.* v. *Phoenix Constr. Co.,* 46 Cal.2d 423, 437-438 [296 P.2d 801, 57 A.L.R.2d 914].) Following the rule of construing the policy against the insurer would give to Aetna a continuing duty to defend for claims arising from the one occurrence.

The construction urged by appellants is that all doubts are to be resolved against the insurer (Aetna). This would involve the use of a selective and narrow construction of the phrase upon which the defense obligation is predicated, i.e., that it relates solely to the nature of the insurance and the person covered and not to the amount. This would then mean that the duty to defend under the terms of the Aetna policy is limited only to the type of coverage but continues as to any amount. On the other hand, if we apply the rule that such phrase is to be given an all-inclusive meaning, the phrase then would embrace reference to the monetary limits of insurance as well as to the type of insurance, and end the duty of Aetna to defend upon paying the amount of $50,000. In determining the extent, nature and the persons covered by a policy using a similar phrase, "to the extent of the coverage and limits of liability required by such [financial responsibility] law" the court in *Continental Cas. Co.* v. *Phoenix Constr. Co., supra,* 46 Cal.2d 423, utilized the liberal and all-inclusive test.

The foregoing discussion focuses on interpretation of the Aetna agreement. However, we are not here considering the rights and obligations between one insured and a single insurer alone. We cannot resolve the dispute by reference to the Aetna contract alone. Aetna does not seek to escape liability for any type of coverage or protection reasonably expected by its insured. (See *Gray* v. *Zurich Insurance Co.,* 65 Cal.2d 263 [54 Cal.Rptr. 104, 419 P.2d 168], *Fireman's Fund Ins. Co.* v.

*Chasson,* 207 Cal.App.2d 801 [24 Cal.Rptr. 726].) We interpret the respective duties of all parties in the light of the several contracts of insurance, the relative position of the insured and the insurers as well as the nature of the calamity giving rise to these claims. No single rubric nor any composite of selected rules of contract construction can alone decide the unique matter at bench.

Appellants' claimed freedom from any defense obligations and costs therefor rests not so much on the clarity of the terms of their policy nor upon any clear legal freedom to deny any defense, but rather more on the application of strained meaning to the terms of the policy of Aetna. Such strained construction should be avoided. (*Hogan* v. *Midland National Ins. Co.,* 3 Cal.3d 553 [91 Cal.Rptr. 153, 476 P.2d 825], *Otter* v. *General Ins. Co.,* 34 Cal.App.3d 940, 951 [109 Cal.Rptr. 831].) If the duty to defend is separate from the obligation and risks of coverage, it can be argued with equal force that the duty of the excess carriers to defend as to excess coverage does not depend upon the presence or absence of any duty by primary carrier to defend against the excess claims.

The language of appellants' policies ("This contract is subject to the same warranties, terms, conditions, exclusions and definitions (except as regards the premium, the obligation to investigate and defend . . .) as are contained in . . . the policy/ies of the primary insurers . . .") indicates only that the premium and the obligations to investigate and defend are unlike that of the primary insurer. That provision does not expressly declare with certainty and clarity that there is no obligation to defend, any more than it declares that there is no obligation to pay a premium. Admittedly, the premium payment provisions are set forth in other parts of the written contract. Nonetheless the law imposes an implied obligation to defend where it is not expressly and clearly omitted from the particular risk. The legion of cases holding insurance carriers to the duty to defend, settle and otherwise deal with and for the insured, imposes duties implied by law in addition to the duties expressly bargained for and set forth in the written contracts of insurance. These cases are decisions imposing added obligation where none expressly existed as much as they are mere interpretations of the language of the provisions containing some express obligation. This is but another way of stating the rule that if the exclusion is unclear or uncertain and is reasonably to be expected by the insured the obligation will be implied by law and included as part of the agreement of insurance. (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, *Comunale* v. *Traders &*

*General Ins. Co.,* 50 Cal.2d 654 [328 P.2d 198].) The idea that the carrier should bear or share pro rata in expenses of providing the defense even without resort to any express contractual provision or written term, is not new and has been followed in other decisions: *Otter* v. *General Ins. Co.,* 34 Cal.App.3d 940, 954-955 [109 Cal.Rptr. 831], *Oil Base, Inc.* v. *Transport Indem. Co.,* 143 Cal.App.2d 453 [299 P.2d 952], *Continental Cas. Co.* v. *Zurich Ins. Co.,* 57 Cal.2d 27 [17 Cal.Rptr. 12, 366 P.2d 455].

Appellants do not demonstrate or direct our attention to any clear and certain statement in their policies that they will not defend against any claims. Hence, by the same considerations by which they urge us to view the responsibilities and obligations of Aetna to Union, we find that appellants as insurers have a coexisting and coequal obligation to defend as representatives and on behalf of the insured Union, with reference to all of the excess claims. With reference to the particular paragraph numbered 7 on which appellants rely to escape liability for defense we answer by using appellant's own language "How simple it would have been to amend the standard language" to say clearly that insurer and insured agree that insurer shall not be required to defend any claim.

■ Whatever Aetna did after the payment of the $50,000 and the payment of costs and defense expenses relative to that amount and up to that point, it did so in the capacity of Union's representative and became equitably subrogated to the rights of Union under Union's contracts with appellants as excess carriers. Thus, the obligation imposed on appellants by the rule of reasonable expectations of Union inure to the benefit of Aetna. When it becomes certain that the claim (or as here a portion of the defense) is not covered by the policy the insurer (Aetna) may turn back the defense to the insured. (*Firco, Inc.* v. *Fireman's Fund Ins. Co.,* 173 Cal.App.2d 524 [343 P.2d 311], *Fireman's Fund Ins. Co.* v. *Chasson,* 207 Cal.App.2d 801 [24 Cal.Rptr. 726].)

Rather than subjecting its insured (Union) to risk of loss or harm for want of a defense, respondent Aetna assumed the defense and expenses for Union's benefit; not because it wanted to or demanded that it be allowed to do so. Aetna did so clearly reserving the right to seek reimbursement. On the other hand, appellants as excess carriers took the adamant position of refusing to defend the insured. Appellants took a hard position that Aetna alone had a duty to defend and appellants had none. Appellants' confidence in their legal wisdom may well have

warranted the entertainment of such opinion, but the potential risk to the insured (Union) did not justify the unyielding refusal to provide any part of the defense. Given appellants' stand, but for the good faith conduct of Aetna the immediate obligation and expenses of defense certainly would have fallen upon the insured, Union.

*Pac. Indem. Co.* v. *Cal. State Auto. Assn.,* 190 Cal.App.2d 293 [12 Cal.Rptr. 20], *Columbia Southern Chemical Corp.* v. *Manufacturers & Wholesalers Indem. Exch.,* 190 Cal.App.2d 194 [11 Cal.Rptr. 762], and *Financial Indem. Co.* v. *Colonial Ins. Co.,* 132 Cal.App.2d 207 [281 P.2d 883], all expressly held that the other or underlying or excess or secondary insurance carriers had no obligations absent a specific contract with the primary or first insurer or with the insured to contribute to or pay for the defense provided by the primary or first insurer assuming the defense. Such view was expressly disapproved in the case of *Continental Cas. Co.* v. *Zurich Ins. Co.,* 57 Cal.2d 27 [17 Cal.Rptr. 12, 366 P.2d 455]. In *Continental Cas. Co.* v. *Zurich Ins. Co., supra,* 57 Cal.2d 27, a dispute arose as to the liability for coverage among three insurance companies, one acting as excess carrier. The language thereof is apposite: "Each of the three policies provided that with respect to the policy coverage the company would 'defend any suit against the insured alleging such injury . . . and seeking damages on account thereof, even if such suit is groundless, false or fraudulent . . . .' "[5]

"Two opposing views appear in the cases where the insured, or an insurer who has faithfully performed, has sought contribution from an insurer who refused to provide a defense. On the one hand it has been held that 'where two companies insure the same risk and the policies provide for furnishing the insured with a defense, neither company can require contribution from the other for the expenses of the defense where one denies liability and refuses to defend.' " (*Continental Cas. Co.* v. *Zurich Ins. Co., supra,* 57 Cal.2d 27, 36.)[6]

"On the other hand there are courts which, with little if any discussion of the point, appear to have found no difficulty in ordering pro rata

---

[5] At bench the excess policies do not expressly promise defense, but as indicated such duty may be implied. It is the *presence* of that duty that is significant—not how determined. That the duty is implied renders it no less than if expressed.

[6] For the purpose of applying the language to the matter at bench and to reach our decision here, we need not resolve the conflict of opposing but possible argument, that the "risks" at bench are not the same—but are in fact two or more "risks," i.e., Aetna, a specific $50,000 amount; Harbor, the next $475,000; and Lloyds, another $475,000 and most of the excess above $1 million to $25 million.

sharing of defense expenses where coverage is provided by more than one insurer. (See *Oil Base, Inc.* v. *Transport Indem. Co.* (1956) 143 Cal.App.2d 453, 469-470 [299 P.2d 952]; see also *American F. & C. Co.* v. *Pennsylvania T. & F.M. Cas. Ins. Co.* (1960) 280 F.2d 453, 459, 460 [4], especially fn. 11; *General Acc. F. & L. Assur. Corp., Ltd.* v. *Smith & Oby Co.* (1959) 272 F.2d 581, 586 [6]; *Bituminous Cas. Corp.* v. *Travelers Ins. Co.* (1954) 122 F.Supp. 197, 204-205 [7].) We find no roadblocks to such a result and we think that the considerations which lead to it are more persuasive than any reasons suggested to the contrary. . . . services contemplated by the agreement to defend . . . [are] employment by the company of competent licensed attorneys and other personnel who, from a practical standpoint, must be viewed as rendering services to the company and for its benefit and the benefit of other obligated insurers, as well as for the benefit of the insured.

"Under general principles of equitable subrogation, as well as pursuant to the rule of prime importance—that the policy is to be liberally construed to provide coverage to the insured—it is our view that all obligated carriers who have refused to defend should be required to share in costs of the insured's defense, whether such costs were originally paid by the insured himself or by fewer than all of the carriers. A contrary result would simply provide a premium or offer a possible windfall for the insurer who refuses to defend, and thus, by leaving the insured to his own resources, enjoys a chance that the costs of defense will be provided by some other insurer at no expense to the company which declines to carry out its contractual commitments. As commented in another context by the court in *Employers etc. Ins. Co.* v. *Pacific Indem. Co.* (1959) 167 Cal.App.2d 369, 381 [334 P.2d 658], quoting from *Massachusetts Bonding & Ins. Co.* v. *Car & Gen. Ins. Corp.* (1957) 152 F.Supp. 477, 482, 'there are . . . compelling reasons for allowing recovery when the other insurer has not entered the case at all or has refused to defend the insured against suit by the injured party. . . . [T]his view represents the current trend and better rule in the "volunteer" situations.'

"The facts that the agreement to defend the insured may be severable from the general indemnity provisions, and that each insurer independently owes that duty to its insured, constitute no excuse for any insurer's failure to perform. The obligation to defend the insured is no less important than the contract to indemnify. In fact, where the insurer defaults in defending, the indemnity obligation will be held to cover all

expenses reasonably incurred by the insured in providing his own defense. . . .

"General urges, nevertheless, that the costs of defense should be paid by only the primary insurer, citing cases in which it appears that the court so ordered. In none of such cases is it shown, however, that the primary coverage was inadequate to indemnify the loss or that the excess policies would at all be reached, and no useful purpose would be served by discussing them further." (57 Cal.2d at pp. 36-38)

Here all parties knew of the fact that Aetna was the primary carrier to the extent of $50,000 per occurrence only. That Aetna should have to provide a defense at a cost far in excess (by several hundreds of thousands of dollars) beyond its primary obligation is unreasonable. It is more reasonable to assume that since the appellants were excess carriers covering risks which as to Harbor extended to half of the next $900,000 and as to Underwriters extended to almost $22 million it would be expected that Harbor (as to a $475,000 pro rata share) and Underwriters would be more readily prepared to assume the additional burden of very unexpected and very large defense expenses.

We hold that under the facts at bench after the payment of the $50,000 of primary coverage, the primary carrier Aetna had no further duty to provide a defense without the right of reimbursement from the excess carriers. The amount of reimbursement is dependent upon facts relative to the total amount paid by all carriers, the proportion of each insurer's payment to the total, all properly determinable by the trial court. In this respect we see no error or abuse of discretion by the trial court.

The duty to defend may be deemed separate from the duty to indemnify and under facts other than those at bench may be broader than the duty to indemnify (see *Gray* v. *Zurich Insurance Co., supra; Blackfield* v. *Underwriters at Lloyd's, London,* 245 Cal.App.2d 271, 272 [53 Cal.Rptr. 838]; *Firco, Inc.* v. *Fireman's Fund Ins. Co.,* 173 Cal.App.2d 524, 527 [343 P.2d 311]). Nevertheless such defense may be provided, and (if it later appears) for liability not covered by, or in excess of the policy, the insurer so providing such defense is entitled to reimbursement where it has reserved such right. Without the right to make such reservation, the primary insurer is placed in an unfair dilemma of defending and by defending possibly waiving its claim of noncoverage. *Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d 263, indicates approval of

this right with the following language: " . . [I]f the insurer adequately reserves its right to assert the noncoverage defense later, it will not be bound by the judgment [against the insured]. If the injured party prevails, that party or the insured will assert his claim against the insurer. At this time the insurer can raise the noncoverage defense previously reserved. In this manner the interests of insured and insurer in defending against the injured party's primary suit will be identical; the insurer will not face the suggested dilemma." (*Gray* v. *Zurich Insurance Co., supra,* 65 Cal.2d at p. 279.)

The insurer can avoid being bound by the judgment against the insured if it secures a nonwaiver agreement from the insured or makes an adequate reservation of rights. (*Coolidge* v. *Standard Acc. Ins. Co.,* 114 Cal.App. 716 [300 P. 885], c.f., *Bear Film Co.* v. *Indemnity Ins. Co.,* 22 Cal.App.2d 520, 523, 524 [71 P.2d 603].) The distinction between a nonwaiver agreement and a reservation of rights is not important here. Aetna clearly made a reservation of rights and communicated such to all parties.

"[A]n insurer in defendant's position retains the ability to enter an agreement with the insured reserving its right to assert a defense of noncoverage even if it accepts a settlement offer. If, having reserved such rights and having accepted a reasonable offer, the insurer subsequently establishes the noncoverage of its policy, it would be free to seek reimbursement of the settlement payment from its insured." (*Johansen* v. *California State Auto. Assn. Inter-Ins. Bureau,* 15 Cal.3d 9, 19 [123 Cal.Rptr. 288, 538 P.2d 744].) At bench respondent Aetna Insurance is in a position similar to that of the insurer described in *Johansen.* Respondent Aetna asserts "noncoverage" for any obligation to defend beyond limit of its primary liability. Aetna should share in providing a portion of the defense to the extent of its pro rata proportion of the payments of the insurance coverage, but it thus remains entitled to recover the expense of providing such defense beyond its pro rata share.

### *The costs and expenses of defense.*

Regarding costs of defense, the Aetna policy provides: "the Company shall . . . (d) pay all expenses incurred by the Company (Aetna), all costs taxed against the Insured . . . [and will] reimburse the Insured for all reasonable expenses, other than loss of earnings, incurred *at the Company's request;* and the amounts so incurred, except settlements of

claims and suits, are payable by the Company in addition to the applicable *limit of liability of this policy.*" (Italics added.) Seemingly, this language is clear; Aetna has agreed to be responsible for all reasonable expenses even when such costs are "in addition to the applicable limit of liability of this policy." From reading the policy, an insured would certainly believe that all costs incurred in defense of actions resulting from the occurrence covered by the policy would be covered by Aetna. As discussed above, it could be argued that the defense includes actions and settlements in excess of the monetary policy limits; hence unless the excess policies provide for coverage of these expenses, Aetna is bound by its agreement.

Continuing on this theory we see that the policies of Harbor and Lloyds provide: " 'Costs' incurred by the assured personally, with the written consent of insurers, and *for which the assured is not covered by the said primary insurers,* shall be apportioned as follows: (A) In the event of . . . claims arising which appear likely to exceed the primary . . . limits, no 'costs' shall be incurred *by the assured* without the written consent of insurers . . . (C) Should, however, the sum for which the said . . . claims may be so adjustable exceed the primary . . . limits, then insurers, if they consent to the proceedings continuing, shall contribute to the 'costs' incurred by the assured in the ratio that their proportion of the ultimate net loss as finally adjusted bears to the whole amount of such ultimate net loss." (Italics added.)

The Aetna policy provision concerning costs and expenses mentioned in part (d), *supra,* is in that part of the policy entitled "II DEFENSE SETTLEMENT SUPPLEMENTAL PAYMENT," and to which the introductory language applies, "With respect to such insurance as is afforded by the policy, the Company shall . . ." Our discussion above, holding that under these particular circumstances this phrase refers to the $50,000 limit of its policy as well as type of coverage and that the insurer Aetna is not obligated to provide all of the defense and the costs thereof without reimbursement, applies equally to this second but similar issue.  ■ . Thus, although payable "in addition" the costs and expenses should be pro rated because only that portion of the additional amount paid for costs attributable to the $50,000 extent of coverage should be paid by Aetna. Again, as in the case of the furnishing of the defense, the costs and expenses were not incurred by the insured (Union) at the request of the Company (Aetna). They were incurred on behalf of and for the sake of the insured subject to a reservation. The obligation for the repayment of the costs and expenses incurred, was abandoned by the

excess carriers at the insured's doorstep in the same basket that included the coequal obligation to defend.

The judgment is affirmed.

Fleming, Acting P. J., and Compton, J., concurred.

A petition for a rehearing was denied April 21, 1976, and appellants' petition for a hearing by the Supreme Court was denied May 26, 1976. Mosk, J., was of the opinion that the petition should be granted.